**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| JACK & JOE'S FRANCHISING, INC. d/b/a SQUEEGEE SQUAD; JACK & JOE'S MANAGMENT COMPANY, | No. 25-cv-2776 (KMM/SGE) |
| Plaintiffs, | |
| v. | **ORDER** |
| EB WINDOW CLEANING LLC; ERIC BERNADIN, | |
| Defendants. | |

---

This matter is before the Court on Plaintiffs Jack & Joe's Franchising, Inc. ("JJFI") and Jack & Joe's Management Company's (collectively "Squeegee Squad") Motion for Preliminary Injunction (Dkt. 8), Squeegee Squad's Motion for Expedited Discovery (Dkt. 14), and Defendant Eric Bernadin's Motion to Compel Arbitration (Dkt. 39). For the reasons discussed below, the Court denies Mr. Bernadin's Motion to Compel Arbitration and grants Squeegee Squad's Motion for a Preliminary Injunction, and Squeegee Squad's Motion for Expedited Discovery is denied as moot.

## BACKGROUND

JJFI is a franchisor that owns businesses providing "window cleaning and other building and residential cleaning and maintenance services[.]" (Dkt. 1 ¶ 2.) In doing so, the franchise utilizes specific "proprietary technology, products, training, and standards . . . for operation," which comprise the "Squeegee Squad System," and operates under the registered trademark "Squeegee Squad®." (*Id.*)

1

In October 2023, Squeegee Squad entered into a Franchise Agreement (or "Agreement") with Mr. Bernadin, who individually operated Defendant EB Window Cleaning LLC, a limited liability company based in Florida. (*Id.* ¶¶ 12–13.) As part of the Agreement, Mr. Bernadin executed a Personal Guaranty "agree[ing] to be personally bound by each and every condition and term contained in" the Agreement. (Dkt. 11-1 at 45.[1])

The Franchise Agreement authorized Mr. Bernadin to use the Squeegee Squad System, as well as Squeegee Squad's trade name and trademarks, for fifteen years. (Dkt. 1 ¶¶ 18–20.) Those rights "applie[d] only to the Franchisee's Squeegee Squad Business within the [agreed on] Territory" (here, Northeast Miami-Dade County) and were conditioned on the franchisee "fully perform[ing] and compl[ying] with" the Agreement. (Dkt. 11-1 at 9–10, § 4.2; *id.* at 47.) The Agreement also prohibited franchisees from performing services outside of their assigned territory without JJFI's approval. (*Id.* at 52.)

Moreover, Squeegee Squad retained its right "to immediately terminate th[e] Agreement without any opportunity to cure" if a franchisee failed to comply with an audit request. (*Id.* at 35, § 16.4(E); *see also id.* at 29, § 13.5.) If the Agreement was terminated, the franchisee's right to use the Squeegee Squad System and its marks "will terminate immediately and revert back to JJFI," and the franchisee was responsible for various post-termination obligations. (*Id.* at 36, § 18.1; *see id.* at 36–37.) Those obligations included complying with a detailed post-termination noncompete provision. Among other things, for 24 months after the end of the Agreement, franchisees were not allowed to engage in a

---

[1] Citations are to the pagination generated by the CM/ECF filing system.

business that competed with Squeegee Squad subject to certain geographical restrictions. (*Id.* at 38, § 19.2(A).) During that 24-month period, former franchisees were also prohibited from "[d]ivert[ing] or attempt[ing] to divert any existing or potential business or customers of JJFI or any other Squeegee Squad franchisee, or providing related services to customers whom the franchisee had serviced while the Agreement was in place. (*Id.*, §§ 19.2(B), (D).) The parties agreed that the noncompete provisions were reasonable (*id.* at 38, § 19.2) and that a franchisee's noncompliance with the Agreement "could cause irreparable damage" to JJFI (*id.* at 40, § 21.5).

In March 2025, upon learning that Defendants "were performing jobs outside of the territory without reporting revenues or sharing revenues with other franchisees," in violation of the Agreement, Squeegee Squad sent an audit letter demanding financial information related to those jobs. (Dkt. 1 ¶¶ 33–34; *see* Dkt. 1-2 (audit letter).) Because Defendants provided an incomplete response, Squeegee Squad issued a second audit notice on April 10, 2025. (Dkt. 1 ¶¶ 35–36.) After Defendants again failed to comply with the audit, Squeegee Squad terminated the Franchise Agreement with Defendants on June 13, 2025. (*Id.* ¶ 39; Dkt. 1-3 (termination letter).)

Squeegee Squad alleges that since then, Defendants have failed to fulfill their post-termination obligations as required by the Agreement. (*See* Dkt. 1 ¶¶ 40–49.) They refused to transfer phone numbers associated with the franchised business and continued to use them "in direct connection with franchise marketing and advertising" using Squeegee Squad's trade name and trademarks. (*Id.* ¶ 41.) Defendants also "used a vehicle bearing the Squeegee Squad Marks," "solicited and diverted former customers[] . . . with the apparent

3

intention to provide false and leading [sic] information about Squeegee Squad," and "forwarded numerous emails from their Squeegee Squad franchised business account to a private email[.]" (*Id.* ¶¶ 43, 46–48.) And they allegedly "engineered a coordinated campaign to publish false and negative reviews on the former franchised business['s] . . . website," most of which were posted after Squeegee Squad terminated the Agreement, by individuals who appear to know or are affiliated with Mr. Bernadin. (*Id.* ¶¶ 51–52; *see, e.g., id.* ¶¶ 53–58 (showing negative reviews and indicating the reviewers are Facebook "friends" of Mr. Bernardin).) On June 29, 2025, Squeegee Squad sent a cease-and-desist letter demanding that Mr. Bernadin stop this conduct. (Dkt. 11-5 at 5.) The letter also reminded Mr. Bernadin that he "continue[d] to be bound by all post-termination contractual obligations under the Franchise Agreement[.]" (*Id.*)

On July 3, 2025, Squeegee Squad initiated this action against Defendants, claiming that they defamed its business and materially breached the Franchise Agreement by infringing on Squeegee Squad's trademarks, violating the noncompete provision, and engaging in unfair competition. (Dkt. 1 at 16–21.) On July 9, 2025, Squeegee Squad filed a Motion for Preliminary Injunction, seeking an injunction in order "to protect their trademarks, enforce their contractual rights," and enjoin Defendants "from continuing . . . to operate a competing business, misappropriate confidential information, divert customers, and defame Plaintiffs through the publication of false and misleading online reviews[.]" (Dkt. 8 at 1.) Six days later, Squeegee Squad moved for expedited discovery, seeking additional information in support of its Motion for Preliminary Injunction. (Dkt.

14.) Mr. Bernadin, who is a pro se litigant, did not file a response to the Complaint or either of Squeegee Squad's motions.

On August 14, 2025, following the filing of Plaintiffs' Motions, the Court held a status conference to see whether the matter could be resolved without further litigation. Because Mr. Bernadin has no attorney, the Court referred the matter to the Early Settlement Conference Project of the Federal Bar Association's Pro Se Project. The Court suspended all pending deadlines while the parties attempted to settle the case. (Dkt. 28.) United States Magistrate Judge Shannon G. Elkins then held a settlement conference on October 28, 2025, which was unsuccessful. (Dkt. 35.)

On November 4, 2025, Mr. Bernadin filed a Motion to Compel Arbitration, arguing that the arbitration clause in the agreement precluded Squeegee Squad from initiating this action, which should be stayed pending arbitration.[2] (Dkt. 39.) The Court now turns to each of these motions, keeping in mind that courts must construe a pro se litigant's filings "liberally." *Smith v. Andrews*, 75 F.4th 805, 808 (8th Cir. 2023) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

---

[2] That same day, Judge Elkins ordered Mr. Bernadin to file an Answer to Squeegee Squad's Complaint and a response to the Motion for Preliminary Injunction by December 4, 2025, which he failed to do. In the same order, Judge Elkins noted that "[a]s a limited liability company Defendant EB Window Cleaning LLC must be represented by counsel to litigate in this court," and ordered EB Window Cleaning LLC to obtain counsel by December 4, 2025 to avoid an entry of default. (Dkt. 38.) After EB Window Cleaning LLC failed to timely obtain counsel, Squeegee Squad filed an Application for Entry of Default. (*See* Dkts. 44–45.) On December 10, 2025, the Clerk of Court filed an Entry of Default pursuant to Rule 55(a) of the Federal Rules of Civil Procedure as to EB Window Cleaning LLC.

## DISCUSSION

### I.    Motion to Compel Arbitration

Mr. Bernadin seeks to compel arbitration, arguing that the parties agreed to arbitrate any disputes arising out of the parties' Franchise Agreement. Squeegee Squad argues that this action falls outside the scope of the arbitration provision.

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable[.]" 9 U.S.C. § 2. Because the FAA reflects a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), "[a]rbitration provisions are broadly enforced unless the arbitration clause cannot be interpreted to cover the dispute," *Mainville v. Coll. Town Pizza, Inc.*, 629 F. Supp. 3d 913, 923 (D. Minn. 2022).[3] Therefore, "[a] court's role under the FAA is . . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute." *Triplet v. Menard, Inc.*, 42 F.4th 868, 870 (8th Cir. 2022) (quotation omitted). If a court determines that a valid arbitration agreement encompasses the dispute, it "must grant a motion to compel arbitration[.]" *3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1198 (8th Cir. 2008). "The party resisting arbitration bears the burden of showing either that the

---

[3] Although courts generally apply the laws of the forum state—here, Minnesota—when evaluating the validity and enforceability of an arbitration agreement, *see Barclay v. Icon Health & Fitness, Inc.*, 550 F. Supp. 3d 710, 717 (D. Minn. 2021), the Court relies largely on federal caselaw applying general principles of contract law, as the only party that has analyzed these issues has, *cf. Krause v. Integra Lifesciences Corp.*, No. 24-cv-4339 (LMP/ECW), 2025 WL 1911735, at *4 (D. Minn. July 11, 2025). Neither party has suggested that the Court's reliance on general principles of contract law would change the outcome.

arbitration provision is invalid or that it does not encompass the claims at issue." *Triplet*, 42 F.4th at 870. Because Squeegee Squad does not challenge the validity of the arbitration agreement, the Court's analysis focuses on whether it encompasses this dispute.

The arbitration agreement states that "all disputes and controversies between [the parties] . . . arising under, as a result of, or in connection with th[e] Agreement . . . or the Franchisee's Squeegee Squad Business will be submitted to binding arbitration under the authority of the [FAA]." (Dkt. 11-1 at 39, § 21.2.) However, that general rule is subject to exceptions "as expressly provided in Article 21.5." (*Id.*) Article 21.5 states, in relevant part, that "[n]otwithstanding Article 21.1[,]" . . . in the event of a breach . . . of any of the terms of th[e] Agreement by the Franchisee," JJFI may "seek an injunction restraining such breach . . . until such time as a final and binding determination is made by the arbitrators." (*Id.* at 40, § 21.5.) It also provides that Squeegee Squad "reserve[s] the right to commence a civil action against the Franchisee . . . to compel the Franchisee's compliance with trademark standards and requirements to protect the goodwill of the Marks[.]" (*Id.*)

Squeegee Squad has met its burden of establishing that the arbitration agreement does not encompass the claims at issue. *See Triplet*, 42 F.4th at 870. In its Complaint, Squeegee Squad alleges that Defendants materially breached various terms of the Franchise Agreement, including that Defendants infringed Squeegee Squad's trademarks. (Dkt. 1 at 16–17, 19.) And Squeegee Squad accordingly sought "an injunction restraining such breach[.]" (*See* Dkt. 11-1 at 40, § 21.5.) This action therefore falls under the exception to binding arbitration set forth in Article 21.5 of the Agreement, and the Court denies Mr.

Bernadin's Motion to Compel Arbitration.[4] *See H&T Fair Hills, Ltd. v. All. Pipeline L.P.*, 76 F.4th 1093, 1099 (8th Cir. 2023) (stating that denial of a motion to compel is proper if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute" (quotations omitted)).

## II.     Motion for Preliminary Injunction

Having concluded that the dispute is not subject to binding arbitration, the Court turns to Squeegee Squad's unopposed Motion for Preliminary Injunction. Specifically, Squeegee Squad seeks an injunction "to protect their trademarks, enforce their contractual rights, and prevent Defendants . . . from continuing their unlawful efforts to operate a competing business, misappropriate confidential information, divert customers, and defame [Squeegee Squad] through the publication of false and misleading online reviews[.]" (Dkt. 8 at 1.)

Under Rule 65 of the Federal Rules of Civil Procedure, courts have the authority to grant preliminary injunctive relief. *See also Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 898 (8th Cir. 2000) (stating that a district court has "broad discretion" in deciding whether to grant a preliminary injunction) (quotation omitted).[5] When deciding whether injunctive

---

[4] In its Opposition to Mr. Bernadin's Motion to Compel Arbitration, Squeegee Squad points out separate bases for denying the Motion. For example, Squeegee Squad argues that Mr. Bernadin's motion failed to meet the procedural requirements of the Local Rules. (*See* Dkt. 40 at 4–5.) But because the Court denies the Motion on the merits, it declines to address these arguments.

[5] Generally, a "court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). "[T]he rule 'implies a hearing in which the defendant is given a fair opportunity to oppose the application [for a preliminary injunction] and to prepare for such opposition.'" *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657,

relief is proper, a court must consider four factors: (1) likelihood of success on the merits; (2) threat of irreparable harm to the movant; (3) a balance of the equities; and (4) the public interest. *See Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). The party seeking relief bears the burden of showing that a preliminary injunction is needed. *Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023).

While no single factor is determinative, the likelihood of success on the merits is considered the "most important." *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Gr., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) (quotation omitted). Moreover, a showing of irreparable harm is necessary to obtain a preliminary injunction. *See Choreo, LLC v. Lors*, 164 F.4th 667, 671 (8th Cir. 2026) (explaining that a movant's failure to show irreparable harm is "an independently sufficient basis" to deny a preliminary injunction) (quotation omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). To satisfy this factor, "a party must show that the harm is certain and great and of such imminence that there is a clear

---

665 (8th Cir. 2022) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 432 n.7 (1974)). Here, Defendants had notice of the Motion for Preliminary Injunction but failed to file a response despite having plenty of time to do so. The Court concludes that an evidentiary hearing is not necessary because there is no "material factual controversy" to resolve. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 744 (8th Cir. 2002) (affirming the district court's discretionary decision to grant a preliminary injunction without holding an evidentiary hearing because "[a]n evidentiary hearing is required prior to issuing a preliminary injunction only when a material factual controversy exists[]").

and present need for equitable relief." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023) (quotation omitted).

### A.      Likelihood of Success on the Merits

#### 1.      Trademark Infringement

A plaintiff bringing a claim for trademark infringement "must establish (1) ownership of a valid trademark; and (2) a likelihood of confusion between the registered mark and the alleged infringing use by the defendant." *Davis v. Walt Disney Co.*, 393 F. Supp. 2d 839, 843 (D. Minn. 2005) (citing *First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040, 1044 (8th Cir. 1996)). As to the first element, a registered mark carries a "strong" presumption of validity, *Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 745 F.3d 877, 882 (8th Cir. 2014) (quotation omitted), and serves as "prima facie evidence of a registrant's exclusive right to use the registered mark in commerce," *id.* at 883 (quoting 15 U.S.C. § 1115(a)) (cleaned up). The first element of trademark infringement is met here, where Squeegee Squad asserts that its marks are registered and have been "extensively advertised . . . in connection with its products and services." (Dkt. 10 at 19–20; *see* Dkt. 11 ¶¶ 5–6 (providing trademark registration numbers).)

As to the second element of a likelihood of confusion, courts must consider six factors:

> (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase.

10

*Co-Rect Prods., Inc. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985) (citing *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)). "[T]he relative weight of the factors depends on the facts of the individual case." *First Nat'l Bank in Sioux Falls v. First Nat'l Bank, S.D.*, 153 F.3d 885, 888 (8th Cir. 1998). A likelihood of confusion requires "a probability of confusion, not merely a possibility." *Lovely Skin, Inc.*, 745 F.3d at 888.

Each factor supports a finding of a likelihood of confusion in this case. First, Squeegee Squad's marks are "strong and distinctive." *SquirtCo.*, 628 F.2d at 1091. One of the three registered marks that Defendants allegedly infringed is the phrase "Squeegee Squad," and the other two marks are black-and-white and colorized versions of Squeegee Squad's service mark containing the trademarked name of its business.[6] (*See* Dkt. 11 ¶ 5.) Next, there is an obvious "similarity" between Squeegee Squad's mark and Defendants' mark because the alleged infringement arises from Mr. Bernadin's unauthorized use of Squeegee Squad's mark to advertise his services, in direct competition with Squeegee Squad. *See Co-Rect Prods., Inc.*, 780 F.2d at 1330. These facts are strongly suggestive of Defendants' "intent to pass off [their] goods as those of the trademark owner." *Id.* (quotation omitted). Furthermore, Squeegee Squad alleges that there likely have been "incidents of actual confusion" where customers seek Defendants' services under the mistaken belief that they are a Squeegee Squad franchisee. (*See* Dkt. 1 ¶¶ 42, 93–94, 100.)

---

[6] Trademark search, U.S. Pat. & Trademark Off., https://tmsearch.uspto.gov/search/search-information (select "Registration number" from left dropdown menu and enter number) (last visited Mar. 16, 2026).

Because Squeegee Squad has established its ownership of valid trademarks and a sufficient likelihood of confusion between its registered marks and the alleged infringing use by Defendants, the Court concludes that Squeegee Squad has established a sufficient likelihood of success on the merits of its trademark-infringement claim.[7]

### 2. Breach of Franchise Agreement

Squeegee Squad has also shown that it has a "fair chance of prevailing" on its breach-of-contract claims. *Sleep No. Corp.*, 33 F.4th at 1016. As an initial matter, it appears that the noncompete provision in the parties' agreement is valid and enforceable under Florida law.[8] The provision operates for two years after termination of the Agreement and restricts former franchisees from competing with Squeegee Squad "within the [t]erritory" it operated in, "within the territories of any other Squeegee Squad business operated by

---

[7] Squeegee Squad's unfair-competition claim appears to be based exclusively on the conduct of Defendants relating to the trademark-infringement claim (*see* Dkt. 1 ¶¶ 99–102), in which case the preliminary injunctive relief granted on the latter claim would adequately address both claims.

[8] Generally, "[a] federal court exercising supplemental jurisdiction over state law claims in a federal question action," as the Court does here, "must apply the substantive law of the forum state, including its choice-of-law rules." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 813 (D. Minn. 2018) (citing *MRO Commc'ns, Inc. v. Am. Tel. & Tel. Co.*, 197 F.3d 1276, 1282 (9th Cir. 1999). The forum state here is Minnesota, where the parties' contractual choice of law provisions are "traditionally enforce[d]." *Patterson Dental Supply, Inc. v. Pace*, No. 19-cv-1940 (JNE/LIB), 2020 WL 10223625, at *5 (D. Minn. June 17, 2020) (quoting *Hagstrom v. Am. Circuit Breaker Corp.*, 519 N.W.2d 46, 48 (Minn. Ct. App. 1994)), unless there is "a persuasive reason" to set aside the provision, *Barclay v. Icon Health & Fitness, Inc.*, 550 F. Supp. 3d 710, 717 (D. Minn. 2021) (cleaned up). The Franchise Agreement contains a choice-of-law provision stating that "the substantive laws of the state in which the Licensee's Squeegee Squad Business is located"—in this case, Florida—govern the interpretation of the Agreement. (Dkt. 11-1 at 70, § 16.)

12

JJFI or any of its affiliates or franchisees," and "within 10 miles" of such areas. (Dkt. 11-1 at 38, § 19.2(A).)

In Florida, a noncompete provision against a former franchisee warrants a presumption that "any restraint 1 year or less" is reasonable and that "any restraint more than 3 years in duration" is unreasonable. Fla. Stat. § 542.335(1)(d) (2025). Florida courts tend to uphold two-year restrictions, which fall between the two presumptions. *See, e.g.*, *Bahia Bowls Franchising LLC v. DJS LLC*, No. 2:23-cv-94-JLB-NPM, 2023 WL 2303048, at *4 (M.D. Fla. Mar. 1, 2023) (citing cases). Also, Florida courts routinely uphold broader geographical restrictions than the one in the parties' agreement. *See, e.g.*, *Autonation, Inc. v. Maki*, No. 03–18896 CACE(03), 2004 WL 1925479, at *3 (Fla. Cir. Ct. Aug. 25, 2004) (upholding a noncompete provision prohibiting party from competing "within 50 miles of" location where former employee previously worked and "within 10 miles of other" locations owned by former employer). And, as required under Florida law, the provision, which covers the Squeegee Squad System, protects Squeegee Squad's "legitimate business interest[s]," including "confidential business or professional information" and "[c]ustomer . . . goodwill associated with . . . [a]n ongoing business or professional practice, by way of trade name, trademark, [or] service mark[.]" Fla. Stat. § 542.335(1)(b). (*See* Dkt. 1 ¶¶ 18–19 (describing the Squeegee Squad System and value of Squeegee Squad's trade name and trademarks).)

Squeegee Squad specifically alleges that Mr. Bernadin continues to "solicit and divert former customers," "provide new job estimates to customers of the former franchised business," and "forward numerous emails from their Squeegee Squad franchised business

13

account to a private email," despite the post-termination noncompete provision prohibiting him from doing so. (*Id.* ¶¶ 46–48.) Squeegee Squad also claims that Defendants failed to fulfill other post-termination obligations in violation of the agreement, including by "refus[ing] to transfer . . . the telephone numbers associated with the franchised business and trademarks[.]" (*Id.* ¶¶ 40–41; *see, e.g.*, ¶¶ 43–45.) Defendants do not dispute any of these allegations. Therefore, Squeegee Squad has established a sufficient likelihood of prevailing on the merits of its breach-of-contract claim.

### 3.      Defamation of Squeegee Squad's Business

Under Florida law,[9] a plaintiff bringing a defamation claim must show "that the defendant published false and defamatory statements concerning him, without reasonable care as to whether those statements were true or false, which resulted in actual damage to the plaintiff." *Am. Airlines, Inc. v. Geddes*, 960 So. 2d 830, 833 (Fla. Dist. Ct. App. 2007). Statements that "tend to injure [a party] in one's business or profession" are defamatory. *Id.* (quotation omitted).

Squeegee Squad alleges that Mr. Bernadin, through associates who have never sought or received Squeegee Squad's services, wrote negative reviews that "falsely accuse Squeegee Squad of unprofessional conduct and poor service" and "expressly urg[e] prospective customers to consider other options for their window cleaning." (Dkt. 10 at 22; *see also* Dkt. 1 ¶¶ 51–59.) Such statements clearly tend to injure Squeegee Squad in its

---

[9] As with the breach-of-contract claims, the Court analyzes the defamation claim under Florida law for the reasons explained above. Again, there is no claim that the Court's reliance on Florida or Minnesota law would change the outcome.

14

business. (Dkt. 1 ¶ 51.) And they were published on a publicly available Google Review website only after Squeegee Squad terminated its Franchise Agreement with Defendants. (*Id.*) As Squeegee Squad points out, "the timing, content, and coordination of the reviews, and their connection to [Mr. Bernadin's personal network]" (Dkt. 10 at 22) support a finding that the statements were made, if not intentionally, "without reasonable care as to" their falsity, *Am. Airlines, Inc.*, 960 So. 2d at 833. Squeegee Squad has alleged actual harm in the form of "lost business opportunities, reputational damage, and difficulty in re-franchising the affected territory." (Dkt. 10 at 22.) The Court concludes that Squeegee Squad has established a likelihood of success on its defamation claim.

### B.      Balance of Harms and the Public Interest

Next, the Court weighs the balance of irreparable harm to Squeegee Squad against the harm to Defendants, as well as the public interest. *See Dataphase Sys., Inc.*, 640 F.2d at 114.

The Court finds that Squeegee Squad has demonstrated it will suffer irreparable harm, in large part by establishing a likelihood of success on its claims. *See Clam Corp., Inc. v. Innovative Outdoor Sols., Inc.*, No. 08–5895 (DSD/AJB), 2008 WL 5244845, at *4 (D. Minn. Dec. 15, 2008) ("Trademark infringement constitutes irreparable harm." (citing *Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 403 n.11 (8th Cir. 1988))); *Kroupa v. Nielsen*, 731 F.3d 813, 820 (8th Cir. 2013) ("Because damage to one's reputation is a harm that cannot be remedied by a later award of money damages, the threat of reputational harm may form the basis for preliminary injunctive relief.").

Squeegee Squad has also described the irreparable, unquantifiable harm that will result from Defendants' continued conduct. Those harms include:

> (1) loss of goodwill associated with Squeegee Squad's trademarks and franchise system; (2) loss of control over its trademarks and Confidential Information; (3) unfair competition by a former franchisee using Squeegee Squad's Confidential Information, methods, and procedures; (4) diversion of customers due to Defendants' unauthorized competing business; (5) obstruction of a new franchisee's ability to reestablish operations in Defendants' former franchised territory; and (6) the systemic risk that other franchisees will emulate Defendants' unlawful conduct and abandon their franchised businesses, which would undermine the integrity of the entire Squeegee Squad® franchise system.

(Dkt. 10 at 3.) On the other hand, the Court cannot readily identify any harm that Defendants would face if the Court were to grant injunctive relief, nor have Defendants described any.[10]

The public-interest factor also weighs in favor of Squeegee Squad. *J & B Wholesale Distrib., Inc. v. Redux Beverages, LLC*, 621 F. Supp. 2d 678, 689 (D. Minn. 2007) ("The public interest weighs in favor of protecting consumers against trademark infringement."); *Powerlift Door Consultants, Inc. v. Shepard*, No. 21-cv-1316 (WMW/ECW), 2021 WL

---

[10] Having concluded that Defendants would not suffer any harm if the Court were to issue preliminary injunctive relief, and considering Defendants' failure to respond to Squeegee Squad's Motion as ordered by the Court, the Court waives the bond requirement set forth in Rule 65 of the Federal Rules of Civil Procedure. *See Minnesota v. U.S. Dep't of Agric.*, No. 25-cv-4767 (LMP/JFD), 2026 WL 125180, at *19 (D. Minn. Jan. 16, 2026) (construing a defendant's "failure to request an appropriate dollar amount" for bond as "a waiver of its obligation to show the damages it would suffer from a wrongful injunction" and accordingly refusing to enter a bond) (citing *Waxing the City Franchisor LLC v. Katularu*, No. 24-cv-2479 (JMB/DJF), 2024 WL 3887109, at *10 (D. Minn. Aug. 20, 2024)).

16

4261251, at *5 (D. Minn. Sept. 20, 2021) ("[E]nforcing contractual obligations, including valid noncompete provisions, serves the public interest."). On balance, these remaining factors strongly favor issuing a preliminary injunction.

* * *

Because each of the *Dataphase* factors weighs in favor of issuing a preliminary injunction, the Court therefore grants Squeegee Squad's Motion for Preliminary Injunction. And because the Court grants the Motion without holding a hearing, Squeegee Squad's Motion for Expedited Discovery is denied as moot.

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT**:

1. Plaintiff's Motion for Preliminary Injunction (Dkt. No. 8) is **GRANTED**. Defendants are **PRELIMINARILY ENJOINED** from violating the post-termination noncompete provision in the parties' agreement and engaging in any acts of defamation, including publishing reviews of Squeegee Squad or any of its franchisees or affiliates. Defendants must also fulfill their post-termination obligations as set forth in the Agreement and are **PRELIMINARY ENJOINED** from any unauthorized uses of Squeegee Squad's protected trademarks.

2. Plaintiff Squeegee Squad's Motion for Expedited Discovery (Dkt. 14) is **DENIED AS MOOT**.

3. Defendant Eric Bernadin's Motion to Compel Arbitration (Dkt. 39) is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY AS TO THE PRELIMINARY INJUNCTION.**

Date: March 27, 2026                    *s/Katherine M. Menendez*
                                        Katherine M. Menendez
                                        United States District Judge

17